McGREGOR W. SCOTT
United States Attorney
ELLEN V. ENDRIZZI
Assistant U.S. Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2716

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) No. 2:06-cr-424 EJG |
|---|---|
| Plaintiff, | ) **UNITED STATES'** |
| | ) **SENTENCING MEMORANDUM** |
| v. | ) |
| | ) Date: June 20, 2008 |
| MICHAEL LEE BRAUN, | ) Time: 10:00 a.m. |
| | ) Honorable Edward J. Garcia |
| Defendant. | ) |

## I. Introduction

Defendant Braun is set for Judgment and Sentencing before this Court on Friday, June 20, 2008, at 10:00 a.m. The United States respectfully requests that the Court impose a sentence of 63 months' imprisonment, a fine of $100,000, mandatory reimbursement in the amount of $41,715.39, a 3-year term of supervised release, and a special assessment of $400. This recommendation represents the top of the applicable advisory Sentencing Guideline range. For the reasons set forth below, this sentence is sufficient but no greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The defendant does not deserve leniency or sympathy from this Court, as his premeditated and long-running criminal activity has caused emotional harm as well as significant monetary costs.

**II. A Sentence at the Top of the Advisory Guideline Range Is Appropriate Based on U.S. Sentencing Commission Commentary**

The Sentencing Guidelines contemplate an upward departure "[i]f the offense involved substantially more than two threatening communications to the same victim or a prolonged period of making harassing communications to the same victim, or if the offense involved multiple victims...." U.S.S.G. § 2A6.1 cmt. n.3(B). Although the United States could seek an upward departure or variance from the applicable advisory Guideline range, it only asks the Court to sentence the defendant to 63 months' incarceration and impose a fine of $100,000, the top of the Guidelines. Given the number of letters, the number of victims, and the content of the letters, such a sentence is necessary and it fairly addresses the defendant's criminal conduct.

In this case, from approximately November 2001 through September 2006, Defendant Braun mailed 58 letters.[1] Like the letters charged in the indictment, some contained white powder, some threatened physical harm, and some both. Other letters were "merely" libelous, like those mailed to Sacramento's City Hall ("Dummy Dan B[] takes bribes and fucks his daughter. Dan B[] is a coward. He fucks Lisa L[]'s daughter. Lisa L[] is a whore for the M&H Developers.") and those mailed to Elk Grove High School ("Lisa L[]'s daughter takes cock in her ass. Fuck you.") Each letter had a return address, identifying someone other than the defendant, and those individuals were victimized, in a sense, because they had to be contacted by federal law enforcement and interviewed. Defendant Braun directed

---

[1] Attached hereto is a chart summarizing the 58 letters, previously provided to the defendant and Probation Officer.

his anger at people by involving them in his vicious letter writing campaign, either as "sender", recipient, or in the body of the letters. In the United States' view, all of these people are victims.

Defendant Braun's letters were deliberate - he chose his victims for particular reasons. Some victims were former girlfriends or women who had spurned the defendant, like Barbie and Lisa, they became whores and " greedy fat face slut[s]" in his writings; others were local figures that the defendant accused of fraud and misconduct, such as fire chiefs, city managers, and councilmembers; others were local reporters and national governmental figures. At least one letter was mailed to the California Superior Court, Department 30, in Sacramento, and it also contained threats and white powder. The planning and precision of the defendant's crimes indicate that these were not random or the sloppy rantings of a drunk. <u>Not one of the letters or envelopes contained physical or trace evidence – no fingerprints, no saliva, nothing</u>. The defendant purposefully targeted these individuals and intended for them to suffer. The victim impact letters submitted to the Court indicate that the defendant succeeded.

Defendant Braun received a two-level increase, pursuant to U.S.S.G. § 2A6.1(b)(2), because the offense involved more than two threats.[2] In this situation, the two-level increase does not adequately address the extent of the defendant's conduct, and the United States submits that a sentence, both incarceration and fine,

---

[2] The United States also notes that "[i]f Braun had been convicted on all counts contained in the Indictment, the guideline computations would have been impacted, as each count involves different victims and a separate harm, and the statutory penalties would have been greater." PSR ¶ 76.

3

at the top of the advisory Guideline range would be more appropriate.

**III. The "3553 Factors" Support
    the United States' Recommended Sentence**

In addition to the Sentencing Guidelines, the factors as set forth in Section 3553 of Title 18 of the United States Code must also be considered before imposition of sentence. They include the nature and circumstances of the offense and the history and characteristics of the defendant, plus a number of general policy issues, including punishment, deterrence, recidivism, and respect for the law. See 18 U.S.C. § 3553(a).

The defendant believes that he deserves a downward variance based on his mental health and his alleged alcoholism. See Def.'s Appl. for Live Testimony at 2-3 (C.R. 36). However, the probation officer did take this information into account in his recommendation, see PSR ¶¶ 80, 82; the defendant just did not receive the recommendation that he wanted.

The United States believes that the PSR, the defendant's own statements and conduct, and the purchased psychological report demonstrate that the defendant is a narcissist who lashes out when he does not get what he wants and who continues to make excuses for his behavior rather than owning up to the harm he has caused others. Defendant Braun's concern is focused on one person – himself – and in an attempt to garner sympathy from the Court, he continues to blame others, including this prosecutor, who have apparently done him wrong. Such whining is indicative of a defendant who has not come to terms with his conduct, and who has no remorse for the emotional and financial damage he has inflicted.

///

**A.  Nature and Circumstances of the Offense**

As set forth above, the defendant sent angry, threatening letters over the course of five years.  What is most notable is that in this case there was no physical evidence.  The FBI and Secret Service laboratories indicated a complete lack of fingerprints and DNA evidence on the letters and envelopes.  When law enforcement searched the defendant's home, they found latex gloves and cotton gloves on the counter near baking soda, the white powder used in the hoaxes.  PSR ¶ 14.  Moreover, as a nuclear scientist, the defendant is especially aware of and trained in trace evidence and cross-contamination, and powder was also found at the defendant's office.  Id.

These facts directly counter the defendant's assertion that "[a]t the time of the events in question, [he] was consuming enormous amounts of alcohol and wrote the letters in an inebriated state.  He subsequently mailed them when he was sober."  Alfred French, M.D. report, dated Jan. 26, 2008, submitted with PSR.  Further, if it is true that the defendant mailed the letters at a time not immediately following their authorship, then the defendant has demonstrated his intent to do cause harm.

Dr. French makes much of the FBI agent's statement that he believed that "the perpetrator views mailing the WMD threat letters as a game."  The psychologist "take[s] this to mean that the investigator did not conclude that Mr. Braun actually intended to hurt anyone but was satisfying some need of his own."  French Report at 8.  However, this is not what the FBI agent meant about it being a "game".  This statement referred to the lack of physical evidence, that Braun in previous interviews - when he had been explicitly

warned to stop sending threatening letters to Barbie and others - continued to send letters, in part, to flaunt the fact that he believed he was smarter than the agents and would not be caught. Indeed it was a sort of game - a game of cat and mouse - that ultimately ended when law enforcement finally witnessed Braun putting letters in a mailbox and could demonstrate probable cause for a search warrant.

**B.  The History and Characteristics of the Defendant**

Defendant Braun's history and characteristics offer insight into his nature, but they do not form the basis for a downward variance. Instead, the United States believes that the information provided supports its recommended sentence.

**1.  Mental Health Issues**

The defendant may suffer from depression and may have experienced major depressive episodes over the course of his life, but he offers his mental health as an excuse for his actions and continues to blame others. For this reason he deserves little, if any, sympathy. Millions of people in the United States suffer from clinical depression, and many take medication for this disease.[3] However, this population is not engaging in wide-spread, long-term criminal behavior.

The defendant is highly educated. PSR ¶ 65. At the barest minimum, the cliché applies - he should know better. Despite a lengthy family history of mental health issues, PSR ¶51, the

---

[3] The defendant is currently taking 150 mg of Wellbutrin for depression. PSR ¶ 58. This is a common antidepressant and 150 mg is not a high dose, as the maximum recommended dose, to avoid side effects, is 450 mg. See http://www.wellbutrin-xl.com, site last visited June 16, 2008, information contained on site copyrighted by GlaxoSmithKline.

6

defendant never received treatment for depression that has plagued him for most of his life, and has caused him to attempt suicide. PSR ¶ 58; see generally French Report. His statements to the Court and to Dr. French seem exaggerated and almost theatrical:

> I have always been alone ... I tried alone to
> solve diseases I didn't know I had ... I had my
> daughter, my only friend, Julia, to lean on ...
> I was on a death march and didn't even know it ...
> I can no longer go on alone. In the past, I
> was merely punished and shoved down the road.

PSR ¶ 21.

Defendant Braun claims that he needs help, yet during the course of his pretrial release and in his interview with the probation officer, he continues to blame and lie about others in order to garner sympathy. For instance, his daughter Julia, who was his "only friend," has not had contact with Braun since she was 15 years old. Yet, in order to shore up his family mental health history, he claims that she might suffer from depression. See PSR ¶ 54. This is not true, and to further portray himself as a victim, Braun claims that his ex-wife was an alcoholic and physically abused him. PSR ¶¶ 54, 55.

Carolyn A. was Braun's girlfriend for 5 ½ years and was his third-party custodian while he was on pretrial release. They had a falling out, and she terminated her custodianship. See PSR ¶¶ 7, 56. However, Braun needed to have someone attend counseling sessions with him. When Braun's ex-wife refused to help him, Braun threatened her and sued her for $5,000. The ex-wife was concerned for her safety and contacted the FBI case agent, and this matter was brought before

the magistrate court.  Ultimately, Braun was ordered not to have contact with his ex-wife, and law enforcement accompanied the woman to the court hearing regarding the alleged "loan".  See PSR ¶ 7; French Report at 5.

### 2. **Alleged Alcoholism**

Defendant Braun also blames and excuses his criminal behavior on his alleged alcohol addiction.  The United States believes that the defendant manufactured this addiction as another means of manipulating others into feeling sorry for him and as a means of feeding his narcissism.  Alcoholism is a serious disease, and this prosecutor has never doubted the veracity of others who suffer from its ills, but the contradictory evidence, the nonexistent physical withdrawal from alcohol, and the wild claims of abuse juxtaposed with the rapid recovery, seems less than truthful and very convenient.

Defendant Braun makes the following claims regarding his addiction to alcohol, as noted in the French Report on page 2:

> [In 2001] I began having a drink maybe once a week and found that the alcohol would numb everything, and numbed the depression, so I started to do that more often, once, twice, three times a week, and then sometimes around 2003 or 2004 it took on a life of its own, by the time I got arrested I was drinking, I had five half-gallons of liquor on my counter ... I would lose track (of the level of consumption) it was sixty or seventy dollars per day, I would spend sixty or seventy dollars (in a bar) and I would go to the liquor store and bring home a couple of cases ... everything from liquors to whisky ... per month.  I was like a glutton tired of drinking the same old stuff, I would drink stuff I didn't like ... progressed to the point of using enormous amounts of alcohol,

French Report at 2, and that he was "drinking heavily, at one sitting 15-24 shots daily."  PSR ¶ 62.

///

In stark contrast to these claims, is the following:

- Carolyn A., the defendant's girlfriend during approximately the entire period at issue, told the probation officer that "there was no indication that Braun was abusing alcohol." She described Braun as "health consci[ous]" and "obsessed with running." The girlfriend also stated that they "occasionally drank together socially but not to intoxication" and she had seen the defendant drunk "less than 5 times" and it was "out of character." While she said that "Braun had alcohol in the house ... she never felt the defendant had an alcohol problem." PSR ¶ 64.

- According to the defendant's long-time employer, Braun never sought assistance for mental health issues or alcohol dependency, and there are no personnel records indicating that his supervisors or co-workers suspected, noted or complained of an alcohol problem. PSR ¶ 63.

- The federal agents conducted at least 12 "trash runs" during the course of the investigation, during a period when the defendant claims his drinking was out of control and that he was downing cases of liquor regularly. Agents never found evidence of excessive alcohol consumption, and they frequently observed the defendant on his 6:00 a.m. runs. The agents never saw the defendant become ill on any of those runs. PSR ¶ 62.

- On September 29, 2006, at 10:00 p.m., a Friday night and at a time when the defendant would normally be drunk, allegedly, the defendant denied that he was under the influence of or had a problem with alcohol and the arresting officer attested that the defendant did not appear under the influence of alcohol. See "Sacramento Sheriff's Department Receiving Screening," attached hereto. (As this information was provided to the United States by the defendant, it is submitted to the Court with a courtesy copy of this memorandum and will not be filed publicly.) However, the next day, the defendant claims that he drinks daily and that he last consumed a 1/5th of hard liquor until drunk, and the date of this consumption was changed from the night of September 29, 2006 to September 28, 2006. See "Sacramento County Sheriff's Department-Correctional Health Services Alcohol and Heroin Intake Questionnaire," attached hereto. Also on that form, the defendant claims that he has never experienced alcohol withdrawal.

- The pretrial services officer did not recommend an alcohol treatment program. On October 17, 2006, the defendant chose to enter Sierra Vista Hospital's Chemical Dependency Intensive Outpatient

Program, which he completed in early December 2006. None of the defendant's medical records indicate or describe any form of alcohol withdrawal symptoms one would normally find at a level of the continuous alcohol consumption the defendant suggests. Indeed, the program supervisor found Braun's progress to be "remarkable".

Undoubtedly, the defendant will again be "distressed" because the prosecutor is "not impressed with his recovery" (something the defendant attributes as a direct quote but is not). See French Report at 1. Whether the "recovery" is genuine or not, the defendant does not deserve a downward departure or variance for his conduct. The Sentencing Guidelines states that "alcohol dependence or abuse is not a reason for a downward departure," U.S.S.G. § 5H1.4 ¶2, and the Court "may not depart from the applicable guideline range based on ... Alcohol Dependence or Abuse." U.S.S.G. § 5K2.0(d)(1).

**C. Social Policy Issues Supporting the
United States' Recommended Sentence**

Section 3553(a) also requires the Court to address the social policies affecting sentencing, including respect for the law, deterrence, and just punishment. A sentence at the top of the advisory Guidelines range accomplishes these three important penal issues.

Defendant Braun demonstrated a complete disrespect for the law during the course of his letter writing campaign. He was told by law enforcement to cease and desist, yet he chose, instead, to ramp up his activities and make his threats more violent.

Defendant Braun knew that the powder in his letters would be perceived as some form of biological toxin, likely anthrax. He callously enjoyed the fright and confusion he caused the person who opened the letter, and often that person was not Braun's target, but an innocent secretary or clerk. Moreover, he caused distress for

10

those persons he identified as the senders of the letters, as they had to be interviewed by law enforcement for serious crimes.

A sentence that includes 63 months' incarceration and a fine of $100,000 will make plain to Defendant Braun, and anyone else who considers hoax and threat letters a "joke," that such actions cause considerable damage, both emotionally and financially, and are deserving of serious punishment. Indeed, a defendant in this district was sentenced to 41 months' incarceration following a conviction at trial for sending two threatening letters to the President of the United States. See United States v. Bier, no. 2:05-cr-277 MCE. This particular defendant was truly mentally ill, did not include any powder in his letters, and was a Criminal History Category IV. Defendant Braun's 58 letters and threatened "poison" far exceeds the previous defendant's criminal activity.

**IV. Conclusion**

Based on his particular criminal conduct and in light of the policy goals identified in 18 U.S.C. § 3553(a) and the advisory Sentencing Guidelines, the United States respectfully requests that the Court sentence Defendant Braun as follows: 63-months' incarceration[4], a $100,000 fine, mandatory reimbursement in the amount of $41,715.39[5], a 3-year term of supervised release, and a

---

[4] The statutory maximum term of imprisonment for each count to which the defendant pled guilty is 60 months; the United States asks that three months of one sentence be imposed consecutively.

[5] Reimbursement is required under 18 U.S.C. § 1038(c), and only includes those moneys expended by "state or local government, or not-for-profit organization that provides fire or rescue service incurring expenses incident to any emergency or investigative response to that conduct." Most of the expense for response and investigation was borne by the federal government and is not represented in the reimbursement figure.

11

$400 special assessment.  Finally, the United States joins in the probation officer's recommendation of immediate remand following sentencing.  See PSR ¶ 84.

Dated: June 13, 2008

                                      Respectfully submitted,

                                      McGREGOR W. SCOTT
                                      United States Attorney

                            By:  /s/ Ellen V. Endrizzi

                                      ELLEN V. ENDRIZZI
                                      Assistant U.S. Attorney